Exhibit "2"

1   THOMAS S. SHADDIX, ESQ.
    Nevada State Bar No.: 7905
2   LAW OFFICE OF THOMAS S. SHADDIX
    6166 South Sandhill Road
3   Suite 146
    Las Vegas, Nevada 89120
4   Telephone: (702) 430-8420
    Facsimile: (702) 522-6069
5   Attorney for Plaintiff,
    NATHANIEL SHAPIRO
6

7              UNITED STATES DISTRICT COURT
                   DISTRICT OF NEVADA
8

9   NATHANIEL SHAPIRO, an individual,        Case No.: 2:17-cv-03033-APG-CHW

10                 Plaintiff,                 **PLAINTIFF'S OPPOSITION TO**
                                              **DEFENDANT'S MOTION TO DISMISS**
11  vs.                                       **PLAINTIFF'S FIRST, SECOND, THIRD,**
                                              **FOURTH AND FIFTH CAUSES OF**
12  CABLE NEWS NETWORK, INC., a               **ACTION FROM PLAINTIFF'S**
    Delaware corporation, PART2 PICTURES      **COMPLAINT**
13  LLC, a New York limited liability
    company, LISA LING, an individual and
14  authorized agent of a business entity
    currently of unknown form, COURTNEY
15  THOMPSON, individually and as
    authorized agent of Defendant PART2
16  PICTURES LLC, HEIDI BURKE,
    individually and as authorized agent of
17  Defendant PART2 PICTURES LLC,
    JACKIE HURWITZ, individually and as
18  authorized agent of Defendant PART2
    PICTURES LLC, AMY BUCHER,
19  individually and as authorized agent of
    Defendant PART2 PICTURES LLC,
20  VINCE KELVIN, a/k/a YANN VON
    KANEL, an individual, BAO THAI VU,
21  a/k/a "TYLER", an individual, LOS
    ANGELES SELF-EMPOWERMENT
22  CENTER, a/k/a THE SELF-
    EMPOWERMENT CENTER, a business
23  entity currently of unknown form; DOES 1
    through 50, ROE Business Entities 51-100,
24

25                 Defendants.

26

27

28

1     **COMES NOW,** Defendant NATHAN SHAPIRO, by and through his attorney, THOMAS

2 S. SHADDIX, ESQ of THE LAW OFFICE OF THOMAS S. SHADDIX, and hereby respectfully

3 files his OPPOSITION TO DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S FIRST,

4 SECOND, THIRD, FOURTH AND FIFTH CAUSES OF ACTION FROM PLAINTIFF'S

5 COMPLAINT. Plaintiff's Opposition is based upon the pleadings in this case as well as the

6 following Memorandum of Points and Authorities, attached Declaration of Nathan Shapiro, and such

7 additional matters as may be judicially noticed or properly come before this Court prior to or at the

8 hearing of this matter.

9

        Dated: May 31, 2018

10

11                         THOMAS S. SHADDIX, ESQ.
                          /s/ Thomas S. Shaddix

12                         Nevada State Bar No.: 7905
                        LAW OFFICE OF THOMAS S. SHADDIX

13                         6166 South Sandhill Road
                        Suite 146

14                         Las Vegas, Nevada 89120

15                         Telephone: (702) 430-8420
                        Facsimile: (702) 522-6069

16                         Attorney for Plaintiff,
                        NATHANIEL SHAPIRO

17

18              **INTRODUCTORY STATEMENT**

19

20     At the outset, Defendants' motion to dismiss should be summarily denied as they have failed

21 to provide Plaintiff's counsel with a DVD of the episode of "This is Life with Lisa Ling" which was

22 able to be viewed, notwithstanding a hand delivery of a DVD to Plaintiff's counsel, in contravention

23 of this Honorable Court's admonition to manually file if necessary since it was not electronically

24 uploaded, *cf.* ECF 20. This has made it impossible for Plaintiff and his counsel to ascertain exactly

25 which version of the infringing episode in question moving Defendants allege actually aired.

Accordingly, they had to resort to other means to review The Episode for analysis.

26     Additionally, it must be noted that Defendants' motion sets forth a highly-selective version

27 of half-truths and outright omissions of facts. Without limitation, one of the most glaring omissions

28

1   is the *fact* that Plaintiff's Treatment which was properly registered with the United States Copyright

2   Office (hereinafter "The Treatment") is the precise document which was submitted to executives at

3   Defendant CNN for approval for production; the same was granted based on The Treatment. Over

4   the next approximately eight (8) months, especially during the time period from October, 2015

5   through January, 2016, Plaintiff worked closely with agents of Defendant Part2 Pictures educating

6   them about the community of "pick-up artistry" and developing the plot, theme, mood, setting, pace,

7   characters and sequence of events for the production entitled "This is Life with Lisa Ling"

8   (hereinafter "The Episode") to be aired on Defendant CNN. Just prior to the production's scheduled

9   filming commenced, Defendants Thompson and Ling became involved in the project[1] and personally

10  met with Plaintiff in Las Vegas, bringing a camera and audio crew along with them. Only a few days

11  later, via an email, Defendant Part2 Pictures officially severed its relationship with Plaintiff. It is

12  believed that Defendant Hurwitz had personal connections, through her brother, with Defendant

13  Kelvin.[2] Again, filming for the episode commenced almost immediately thereafter. The story line,

14  plans and production schedule were already in place based upon The Treatment and Plaintiff's hard

15  work. Scenes were re-shot, which does not constitute "hard" news, not to mention a *journalistic*

16  *expose'* [ECF 15, p. 2, l. 12]. Defendants concede access to The Treatment (it was personally

17  delivered to Defendant Bucher), and their 'high degree of access' to it; moreover, through other

18  sources, Plaintiff asserts that there are multiple substantial similarities of Copyright-protected

19  material between The Treatment and The Episode which aired, as will be discussed in further detail

20  *infra*.

21       Wherever moving Defendants got the notion that The Treatment was a "competition" is

22  beyond any logical comprehension; it was not ever intended to be. [ECF 15, p.10, l.13; p.14, l.14].

23  This negates FN 4 of Defendants' motion speaking of 'contestants and eliminations' in *Parker v.*

24  *Viacom Int'l, Inc.*, 605 F. Supp. 2d 659, 662 n. 2 (E.D. Pa. 2009). This so-called "competition"

25

26       [1] It was communicated to Plaintiff that Defendant Thompson had been on another production
     assignment prior to her and Defendant Ling's first meeting with Plaintiff.

27

28       [2] Defendant Kelvin has been personally served after evading the same; this will be addressed
     in a subsequent pleading.

1   theme is a recurring and blatantly purposeful attempt to mislead the Court and falsely categorize The

2   Treatment as a negative, artificially contrived production, and The Episode as a noble, *journalistic*

3   *expose'*, when frankly, quite the opposite is actually true. Therefore, all comparisons to previous

4   specific shows made in Defendant's motion are not relevant at all.

5                              **STATEMENT OF RELEVANT FACTS**

6         The relevant facts to this Opposition are set forth with particularity in Plaintiff's original

7   complaint on file herein [ECF 1].

8                                **POINTS AND AUTHORITIES**

9   **1. Plaintiff's Treatment Registered with The United States Copyright Office is Valid**

10        The Treatment is an original work of authorship fixed in a tangible medium of expression,

11  thus rendering it subject to copyright protection. After registration, and Plaintiff's receipt of the

12  certificate of same, it was provided to agents of Defendant Part2 Pictures. The subject matter of The

13  Treatment formed the basis for continuing discussions between Plaintiff and agents of Defendant

14  Part2 Pictures, and the ultimate production of The Episode which aired on Defendant CNN's

15  network. While a court may determine substantial similarity on a motion to dismiss, given all legal

16  requirements are met, Defendants' reliance on *Christianson v. West Pub. Co.,* 149 F.2d 202, 203 (9th

17  Cir. 1945) is not compelling. The holding states in pertinent part that "[t]he outline map of the

18  United States with state boundaries is in the public domain and is not copyrightable." *Id.* The

19  Treatment is certainly not within the "public domain."

20        "Copyright law protects an author's interest in an original work that has been fixed in a

21  tangible medium that allows it to be "perceived directly or with the aid of a machine or device." 17

22  U.S.C. § 102(a); see generally *Feist Publications, Inc. v. Rural Tele. Serv. Co.*, 499 U.S. 340, 361,

23  111 S.Ct. 1282, 113 L.Ed.2d 358 (1991). Copyright law does not protect ideas themselves, but rather

24  the expression of those ideas. *Feist*, 499 U.S., at 362, 111 S.Ct. 1282 (compilation of unprotectable

25  facts may gain protection through selection and arrangement); *Metcalf v. Bochco*, 294 F.3d 1069,

26  1074 (9th Cir.2002) (citing *Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1045 (9th Cir.

27  1994)). Unprotectable elements include general plot ideas and "scènes à faire," which are scenes that

28  flow naturally from unprotectable basic plot premises and "remain forever the common property of

1     artistic mankind." *Id.* On the other hand, "protectable expression includes the specific details of an

2     author's rendering of ideas, or 'the actual concrete elements that make up the total sequence of events

3     and the relationships between the major characters.' *Id.*, citing and quoting from *Berkic v. Crichton*,

4     761 F.2d 1289, 1293 (9th Cir.1985).'" *Milano v. NBC Universal, Inc.,* 584 F. Supp. 2d 1288, 1293-

5     1294 (C.D. Cal. 2008).

6       These basic principles of copyright law provide the foundation for a copyright infringement

7     claim. To establish copyright infringement, a plaintiff must show that: (1) he owns the copyright; and

8     (2) defendant copied or infringed protected elements of the work. *Shaw v. Lindheim*, 919 F.2d 1353,

9     1356 (9th Cir.1990); *4-13 Melville B. Nimmer, et al., Nimmer on Copyright §13.01* (2005)

10    ("Nimmer"). Absent direct evidence of copying, proof of infringement involves fact-based showings

11    that (1) ***the defendant had access to the plaintiffs work***;[3] and (2) ***the two works are "substantially***

12    ***similar."*** e.g., *Funky Films, Inc. v. Time Warner Entm't Co.*, 462 F.3d 1072, 1076 (9th Cir. 2006)

13    (citing *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 481 (9th Cir.2000)). ***Where a high degree***

14    ***of access is shown, courts require a lower standard of proof for substantial similarity.*** *Swirsky v.*

15    *Carey*, 376 F.3d 841, 844 (9th Cir. 2004) (citing *Bolton*, 212 F.3d at 485)." [Emphasis added].

16       During the story editing and finalizing portion there can be no question that Defendant Part2

17    Pictures and its agents had "a high degree of access" to The Treatment, as they had it for the better

18    part of a year prior to the commencement of the filming of The Episode and 11 months thereafter

19    before its broadcast, and they knew it had been registered with the United States Copyright Office

20    . In the case at hand, there is no need for a "lower standard of proof for substantial similarity",

21    because, as will be discussed herein, there is adequate substantial similarity between The Treatment

22    and The Episode.

23

24

25       [3] Footnote 2 (on p. 7) of ECF 15 which states "[s]olely for the purposes of this motion, Part2 does not challenge access" is a ridiculous and preposterous attempt at a limited admission; Defendant

26   Part2 Pictures knows full well they had The Treatment for 8 months prior to the beginning of filming, (and an additional 11 months before The Episode aired) and used the same in the

27   formulation of The Episode. Part2 Pictures also learned after receiving The Treatment, and well before production and filming started, that it was properly registered by Plaintiff with The United

28   States Copyright Office during this time (as well as registered with the Writer's Guild of America).

1   **2. <u>Analysis of The Treatment and The Episode passes the Extrinsic Component</u>**

2       Defendants cite *Funky Films, Inc. v. Time Warner Entm't Co.,* 462 F.3d 1072 (9th Cir. 2006)

3   as an argument that this litigation cannot pass the Extrinsic Component of copyright infringement.

4   They cite "[t]he extrinsic test focuses on "articulable similarities between the plot, themes, dialogue,

5   mood, setting, pace, characters, and the sequence of events of the two works." *Id.* [ECF 15 at p. 8,

6   ll. 10-12]. Although based on a motion for summary judgment, also contained in *Funky Films* is the

7   analysis the court must undertake when considering the Extrinsic Component: "[P]rotectable

8   expression includes the specific details of an author's rendering of ideas." *Metcalf v. Bochco*, 294

9   F.3d 1069, 1074 (9th Cir. 2002). However, scenes à faire, which flow naturally from generic

10  plot-lines, are not protectable. *Id.* We "must take care to inquire only whether 'the protectable

11  elements, standing alone, are substantially similar.'" *Cavalier v. Random House*, 297 F.3d 815, 822

12  (9th Cir. 2002) (quoting *Williams*, 84 F.3d at 588 (emphasis in original)). In so doing, we "filter out

13  and disregard the non-protectable elements in making [our] substantial similarity determination."

14  462 F.3d 1072 at 1077.

15      The *Funky Films* court also held that "No amount of proof of access will suffice to show

16  copying if there are no similarities," 462 F.3d 1072, 1081 [citing *Sid & Marty Krofft Television

17  Prods.*, *Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1164 (9th Cir.1977)].

18      The *Funky Films* case contained a comprehensive analysis of the dissimilarities between the

19  two works. To the contrary, in this case, there are numerous protectable similarities between The

20  Treatment and The Episode. For example, and without limitation, consider the following substantial

21  similarities, in which precise language from The Treatment is highlighted in quotation marks:

22      (1)    Both The Treatment and The Episode feature a "diverse group" of students;

23      (2)    Both The Treatment and The Episode feature as part of this "diverse group" African-

24      American students (Omari was the African-American student to be featured in The

25      Treatment);

26      (3)    Both The Treatment and The Episode feature as part of this "diverse group" a "Latin"

27      student (Gabriel was the bald Latin featured in The Episode);

28      (4)    Both The Treatment and The Episode feature students who are "geeks and normal

guys";

(5) both The Treatment and The Episode are produced in the "Las Vegas" area;

(6) both The Treatment and The Episode involve "Pick-Up Artist Gurus";

(7) both The Treatment and The Episode involve "Pick-Up Artists" with "existing business(es)";

(8) both The Treatment and The Episode involve "teaching guys" (the students) "how to get better with women";

(9) both The Treatment and The Episode contain a residential component with coaching;[4]

(10) The Treatment describes, and The Episode has, substantial scenes which are set in the "high-energy night clubs of Las Vegas";

(11) both The Treatment and The Episode include the use of "hidden cameras and audio (to) record the students' failures";

(12) both The Treatment and The Episode include the use of "hidden cameras and audio (to) record the students' triumphs;

(13) both The Treatment and The Episode involve "awkward conversations";

(14) both The Treatment and The Episode involve "comedic(ally) . . . conversations" (The Episode's main student 'Mitch' asks a woman in a Las Vegas nightclub to teach him how to dance, to which she replied 'I dance naked');

(15) both The Treatment and The Episode involve conversations concerning "deep(ly) personal childhood stories";

(16) both The Treatment and The Episode's conversations "lead to emotional connection(s)";

(17) both The Treatment and The Episode are set "amidst all the crazy ("pressure cooker") Vegas times and fast sex" (in The Episode it is clearly inferred that Omari had sex with the girl a hidden camera showed him "making out" with, while Lisa Ling sat on

---

[4] It is inconsequential to this analysis that Defendant Kelvin apparently neither had the means nor access to a large house at that time, which frankly was not a "mansion" but rather a large custom home.

the bed with the Pick-Up Artist Guru);

(18)  both The Treatment and The Episode involve how the "students are taught how to be social, fun";

(19)  both The Treatment and The Episode involve how "the students are taught how to relate and connect with their suppressed sexual desire";

(20)  both The Treatment and The Episode involve the students' "epiphanies of greater awareness on this self-discovery journey";

(21)  both The Treatment and The Episode programs are run by "unattractive short ... guy(s)";

(22)  both The Treatment and The Episode programs involve the principal "Pick-Up Artist" Gurus (the leaders) who date (women) out of their league";

(23)  both The Treatment and The Episode involve the "assistance by a team of good looking coaches" which "the camera loves";

(24)  both The Treatment and The Episode leaders are assisted by an attractive female coach, appealing to the respective productions;

(25)  both The Treatment and The Episode "include a woman which female viewers will relate to";

(26)  both The Treatment and The Episode include "makeovers", in fact one of the "makeovers" was performed by Defendant Ling herself, demonstrating the absence of her being an objective observer;

(27)  both The Treatment and The Episode include "formal lessons";

(28)  both The Treatment and The Episode include "casual conversations around the kitchen", as well as makeover lectures;

(29)  both The Treatment and The Episode include situations in which "guys will learn the best ways to eliminate rejection while they approach women";

(30)  both The Treatment and The Episode include situations in which "guys will learn the best ways to ... get phone numbers";

(31)  both The Treatment and The Episode include situations in which "guys will learn the

1     best ways to ... be present in the moment";

2    (32)  both The Treatment and The Episode include situations in which "guys will learn the

3     best ways to ... turn casual interactions sexual";

4    (33)  both The Treatment and The Episode involve "students (who are) looking for "The

5     One";

6    (34)  The Treatment involves "students ... looking for "The One." The Episode involves

7     its main student 'Mitch' tells Defendant Ling he is looking for ... "The" Special

8     "One" (while being interviewed by Defendant Ling literally sitting on a bed with him,

9     a setting clearly chosen for its suggestive and salacious nature, and which clearly calls

10     Defendant Ling's *journalistic* objectivity into question);

11   (35)  both The Treatment and The Episode involve "men with (an) endearing handicap";

12   (36)  both The Treatment and The Episode involve students with Amblyopia ("lazy eye");

13   (37)  the students with Amblyopia in both The Treatment are 'Edward', and in The

14     Episode 'Mitch'.

15   (38)  Although featured in both The Treatment and The Episode, Amblyopia is a relatively

16     rare medical condition affecting only 2% of the population;

17   (39)  both The Treatment and The Episode involve at least "one (student) with extreme

18     social anxiety";

19   (40)  both The Treatment and The Episode involve a student who is represented to be a

20     "virgin" (as alleged in ECF 15, p. 15, l. 24);

21   (41)  both The Treatment and The Episode involve "some (students) who will fail

22     epically";

23   (42)  both The Treatment and The Episode involve "an overweight guy";

24   (43)  both The Treatment and The Episode involve "most (students who) will become men

25     women want to be with";

26   (44)  both The Treatment and The Episode involve students who transform themselves into

27     "men women want to be with";

28   (45)  The Episode includes a scene in which at least two students' voices are heard,

1    notwithstanding the fact that they were under a non-disclosure agreement with

2    Plaintiff, and had signed no release(s) with Defendant Part2 Pictures;[5]

3    (46)    There is a scene in which Defendant Kelvin's website is shown in which the word

4    "TRANSFORMATION", in bold, capital letters is shown, which at first glance could

5    be confused with "TRANSFORMANSION." Because the connection is neither

6    referenced or explained, this similarity was not utilized in the calculation set forth in

7    FN 5 below.

8    It is respectfully submitted that the listed points of "substantial similarity" clearly establish

9    "*articulable similarities* between the plot, themes, dialogue, mood, setting, pace, characters, and the

10   sequence of events of the two works," i.e. [The Treatment and The Episode], *Funky Films*, 462 F.3d

11   1072, 1077 (9th Cir. 2006). [Emphasis added].

12   **3. The Scènes à Faire Doctrine Does Not Apply to this Analysis**

13   The Episode does not contain "situations and incidents which flow naturally from a basic plot

14   premise." Under the . . . doctrine of scènes à faire, courts will not protect a copyrighted work from

15   infringement if the expression embodied in the work necessarily flows from a commonplace idea...."

16   *Ets-Hokin v. Skyy Spirits Inc.*, 323 F.3d 763, 765. Rather, the important aspects of the plot, theme,

17   mood, setting, pace, characters and sequence of events were in place, and the swift commencement

18   of the filming schedule was planned, at the time Defendants severed their relationship with Plaintiff

19   and replaced him with Defendant Kelvin.

20   Additionally, "Google cannot rely on the scènes à faire doctrine as an alternative ground upon

21   which we might affirm the copyrightability judgment of the district court. This is so for several

22   reasons. First, as noted, like merger, in the Ninth Circuit, the scènes à faire doctrine is a component

23   of the infringement analysis. "[S]imilarity of expression, whether literal or non-literal, which

24   necessarily results from the fact that the common idea is only capable of expression in more or less

25   stereotyped form, will preclude a finding of actionable similarity." 4 Nimmer on Copyright §

26

27   _____

28   [5] It is noteworthy that **79% (actually 78.98%)** of The Episode is calculated by Plaintiff to
     be "substantially similar" to The Treatment.

1   13.03[B][3]. Thus, the expression is not excluded from copyright protection; it is just that certain

2   copying is forgiven as a necessary incident of any expression of the underlying idea. See *Satava*, 323

3   F.3d at 810 n. 3 ("The Ninth Circuit treats scènes à faire as a defense to infringement rather than as

4   a barrier to copyrightability."). *Oracle America, Inc. v. Google Inc.,* 750 F.3d 1339, 1364 (Fed. Cir.

5   2014).

6        In this case, it is noteworthy that the *Oracle* court held that "[t]he expression is not excluded

7   from copyright protection; it is just that certain copying is forgiven as a necessary incident of any

8   expression of the underlying idea . . . ("The Ninth Circuit treats scènes à faire as a defense to

9   infringement ***rather than as a barrier to copyrightability.***")" [Emphasis added]. The *Oracle* court

10   "reversed the district court's copyrightability determination with instructions to reinstate the jury's

11   infringement verdict." *Id.* at 1381.

12        The Treatment contains extremely unique elements, many of which are quite clearly

13   substantially similar to The Episode, which are not "standard," "stock," or "common" to a particular

14   topic, or that "necessarily follow[s] from a common theme or setting." See *Autoskill, Inc. v. National*

15   *Educational Support Systems, Inc.*, 994 F.2d 1476, 1494 (10th Cir., 1993). Again, after months of

16   work between Plaintiff and Defendant Part2 Pictures, the "plot, themes, mood, setting, pace, and

17   sequence of events" were in place, as well as the filming schedule which was complete before

18   Defendants Part2 Pictures and Ling severed their business ties with Plaintiff.

19        The 9th Circuit has further addressed the issue of the "presumption of validity of the

20   Plaintiff's copyright registration" and "scènes à faire motives" as separate inquiries as follows:

21        "To establish a successful copyright infringement claim, a plaintiff must show that (1) she

22   owns the copyright, and (2) defendant copied protected elements of the copyrighted work. Apple

23   Computer, Inc. v. Microsoft Corp., 35 F.3d 1435, 1442 (9th Cir.1994), cert. denied, --- U.S. ---, 115

24   S.Ct. 1176, 130 L.Ed.2d 1129 (1995). Because direct evidence of copying is not available in most

25   cases, plaintiff may establish copying by showing that defendant had access to plaintiff's work and

26   that the two works are "substantially similar" in idea and in expression of the idea. Id.

27        We use a two-part test in determining whether two works are substantially similar. Id. the

28   "extrinsic" test considers whether two works share a similarity of ideas and expression based on

external, objective criteria. Id.; Shaw, 919 F.2d at 1356-57. Analytic dissection of a work and expert testimony are appropriate to the extrinsic test. Apple Computer Inc., 35 F.3d at 1442. If plaintiff satisfies the extrinsic test, then the subjective "intrinsic test" asks whether an "ordinary, reasonable observer" would find a substantial similarity of expression of the shared idea." Id.

If *"[a]nalytic dissection of a work and expert testimony are appropriate to the extrinsic test"*, *Apple Computer* at 1442, Plaintiff has provided an analytic dissection of the work in which he calculates 78% substantial similarity between The Treatment and The Episode. However, this case is not even at the point yet where Plaintiff has been able to procure *expert testimony* for that analysis.

"The presumption of originality created by a Certificate of Registration is not relevant to the district court's scènes à faire determination. A Certificate of Registration only creates a rebuttable presumption of originality applicable to a defendant's attack on the validity of a plaintiff's copyright. *7 North Coast Industries v. Jason Maxwell, Inc.*, 972 F.2d 1031, 1033 (9th Cir.1992) ("Under our copyright law, the registration of the copyright certificate itself establishes a prima facie presumption of the validity of the copyright in a judicial proceeding...."). This court has neither transferred the presumption of originality from the "validity" inquiry to the "copying" inquiry nor converted it into a presumption that parts of a plaintiff's work are not scènes à faire. See, e.g., *Apple Computer, Inc.*, 35 F.3d at 1444-45 (considering scènes à faire inquiry and originality inquiry separately). Accordingly, the district court did not err by failing to address appellants' "presumption of originality" in deciding whether similarities between appellants' and appellees' work were attributable to "scènes à faire" motives." *Smith v. Jackson*, 84 F.3d 1213, 1219 (9th Cir. 1996).

### 4. Plaintiff's State Law Claims

The 9th Circuit has addressed this issue:

### "Federal Copyright Does Not Preempt MedTrak's State

### Deceptive Trade Practices and Unfair Competition Claims

The parties agree that the Ninth Circuit has established a two-pronged test to determine Copyright Act preemption. *Laws v. Sony Music Entm't, Inc.*, 448 F.3d 1134, 1137-38 (9th Cir. 2006); *Kodadek v. MTV Networks, Inc.*, 152 F.3d 1209, 1212 (9th Cir. 1998). Only where (1) the subject

matter in the claim is within the subject matter of the Copyright Act; and (2) the state law rights are equivalent to rights protected under the Copyright Act, may the claim be preempted. Laws, 448 F.3d at 1137-38; see also *Salestraq America, LLC v. Zyskowski*, 635 F.Supp. 2d 1178, 1184 (D.Nev. 2009) (holding that a state law claim is preempted only if the copyright infringement "necessarily violates a state created right...") (emphasis added). In other words, if a plaintiff can possibly prevail on a state law claim without a corresponding act of infringement by defendant, the relief sought is not legally "equivalent" to a protected right under the Copyright Act and thus cannot be preempted. See *Id.*

MedTrak concedes that the first prong of this test has been met, as the VNG Software at issue is protected by copyright. MedTrak argues that the second prong is not met because its state law claims are not "equivalent" to its federal copyright claim. The Ninth Circuit has held that state law claims are not equivalent-and thus not preempted-when the following conditions are present: (a) the state claim protects different rights from those of copyright (which protects only the rights of "reproduction, preparation of derivative works, distribution, and display"), and (b) the state claim has an "extra element" than that of a federal copyright claim. *Del Madera Properties v. Rhodes and Gardner, Inc.*, 820 F.2d 973, 977 (9th Cir. 1987) overruled on other grounds by *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994)."

In the case at hand, the "extra element" that is not equivalent to Plaintiff's federal copyright claim is the disparagement of Plaintiff and his work by Defendant Kelvin to Defendant Thompson, who then communicated the same to Defendant Ling, the host of the show, who wielded great power as such. Again, it was subsequently ascertained by Plaintiff that there were "connections" between Defendant Thompson and Defendant Kelvin, and regardless of Defendant Part2 Pictures assurances in writing to Plaintiff that it 'was a go' - Plaintiff alleges Defendant Thompson's late arrival into the production right before filming was scheduled, effectively cut Plaintiff out of the project. Defendants can argue that "'congruent' state law claims, including claims under *California* unfair competition law, are impermissible." *Aagard v. Palomar Builders*, 344 F. Supp. 2d 1211, 1216 (E.D. Cal. 2004) [Emphasis added]; nevertheless this is a *Nevada* case, *Id. Salestraq America, LLC,* 635 F.Supp. 2d at 1184.

-13-

### 5. The Defamation Claim is Not Time Barred

Plaintiff was unaware at the time when The Episode initially aired by Defendant CNN as "A CNN Original Series." Nor was he aware at the time the circumstances which had transpired which gave rise to his being cut from the production at the last minute after many months of hard work with agents of Defendant Part2 Pictures. It was mid-year 2016 when Plaintiff learned of the actual facts and circumstances surrounding the events from a member of the PUA community. Accordingly, this action was filed within the statutory time constraints set forth in NRS 11.190(4)(c).

### 6. The Plaintiff Has Pled a Viable Defamation Claim

When Defendant Thompson came into the production soon before filming, Defendant Part2 Pictures had already developed a relationship with Defendant Kelvin as a result of Defendant Hurwitz's brother's connections with Defendant Kelvin. Defendant Kelvin communicated with Defendant Thompson and made materially untrue and defamatory statements about Plaintiff and his business and coaching techniques to her. Defendant Thompson then communicated these materially untrue and defamatory statements to Defendant Ling. Moreover, Plaintiff received threatening messages from Defendant Kelvin in which he threatened to ruin him. Defendant Thompson's communication of these materially untrue and defamatory statements about Plaintiff were made to Defendant Ling, a third person, they were unprivileged, they amounted to fault that was at least negligent since after all of Plaintiff's work, they did not even inquire about the defamatory allegations, and there were both actual damages (Plaintiff's reputation in PUA community was so damaged that he lost his business)[6] and presumed damages as Plaintiff is a private individual. This meets the criteria set forth in Pegasus v. Reno Newspapers, 57 P.3d 82, 90 (2002).

### 7. Plaintiff Has Pled a Viable Tortious Interference With Contract Claim

Likewise, Plaintiff had previously purchased an event from Defendant Kelvin entitled "PUA Summit" for a substantial amount of money. It had a duration of ten (10) years, as well as non-

---

[6] During the week of filming, Defendant Kelvin crept into the Mansion at approximately 5:30 a.m., and told all of Plaintiff's then students to be quiet, gather their things, and leave with him to check in to "The Rumor" resort (now "Serene"). Plaintiff had been asleep, heard some commotion, but it was not uncommon for there to be comings and goings at such an early hour.

1  disclosure, non-competition and non-circumvention clauses. ***Plaintiff had previously informed the***
2  ***Part2 Picture Defendants of the existence of this contract.*** Accordingly, notwithstanding their
3  knowledge of the existence of the contract, the Part2 Picture Defendants still undertook actions to
4  disrupt the same, causing a material breach on the part of Defendant Kelvin. There was clearly actual
5  disruption of the contract, and Plaintiff's damages have been made quite clear in this case already.
6  This clearly meets the standard of *Operation: Heros v. Procter & Gamble Prods.*, 2015 WL 5768534
7  at *3 (D. Nev. 2015). The other cases cited by moving Defendants are factually distinguishable and
8  therefore not on point.

9        In addition, moving Defendants interfered with the contracts of at least three (3) of Plaintiff's
10  talent who were in The Episode. There were many communications from Defendant Part2 Pictures
11  and its Defendant agents *begging* Plaintiff to coerce his students to sign releases, which these
12  students did not; in fact, Defendant Part2 Pictures even directly solicited Plaintiff's talent on several
13  occasions effectively asking them to disregard their previous contractual obligations and sign the
14  releases anyway. ***After the desert portion of the filming was complete,*** but before the Las Vegas
15  nightclub filming, Defendants Ling, Thompson and Hurwitz had a meeting with Plaintiff at the
16  Mansion, without a camera crew, and in a tense exchange, attempted to manipulate Plaintiff into
17  coercing his coaching students to sign releases and thus not be in violation of their agreements with
18  Plaintiff. On the first working day immediately after they returned home, Defendant Part2 Pictures
19  *officially* severed its business relationship with Plaintiff via email.

20        As will be discussed in more detail *infra*, NRS 597.790 does not apply, because The Episode
21  most certainly was not a "documentary", nor was it "in connection with a news, public affairs or
22  sports broadcast or publication." To suggest otherwise is preposterous.

23                        **8. Plaintiff Has Pled a Viable Civil Conspiracy Claim**

24        At a minimum, and without limitation, Defendants Kelvin, Thompson and Ling engaged in
25  a meeting of the minds and concerted action to accomplish an unlawful objective for the purpose of
26  harming (Plaintiff, and) damage certainly resulted from act or acts, thus meeting the standard set
27  forth in *Weinstein*, 2011 WL 90085, at *9. There are multiple "civil wrongs" in this litigation
28  committed against Plaintiff establishing prospective damages, e.g. Defendant Part2 Pictures did have

preliminary discussions with Plaintiff about producing a series around him and his business and what we do prior to Defendant Kelvin's calculated defamatory statements about Plaintiff.

As a result of the influence and material misstatements of fact (defamation) Defendant Kelvin had on, and communicated to, Defendant Thompson, Defendant Thompson convinced Defendant Ling into an agreement to cut Plaintiff completely out of the production of The Episode. As detailed in AN 6, *supra*, after clandestinely collecting all of his program participants and Plaintiff's prospective students (who were to become his students that very day) in a parking lot only a few blocks from the Mansion after he clandestinely convinced to come with him at approximately 5:30 a.m., he proceeded to make defamatory material misrepresentations of fact about Plaintiff to them. Plaintiff is aware of this because he was contacted later by some of these individuals telling him what was said and that they didn't think he was this terrible person as described, and as was communicated by Defendant Kelvin. Filming of The Episode had already begun, and Plaintiff was substantially later informed that Defendant Kelvin had, utilizing the same ulterior motives and defamatory techniques, convinced Defendants Thompson and Ling to agree to remove Plaintiff from the production and substitute him with Defendant Kelvin. As a result of this agreement and meeting of the minds, Plaintiff has certainly suffered significant damages as a direct and proximate result of the same.

**9. The Episode is Not Protected as a "Newsworthy" Production Nor is it "Fair Use"**

The moving Defendants, although not specifically stated, by their multiple suggestions that this was a *journalistic expose'* and therefore newsworthy, seem to be attempting to invoke the "Fair Use Doctrine" set forth in 17 U.S.C. §107, which states as follows:

> Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as **criticism, comment, news reporting**, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include -
>
> (1) the purpose and character of the use, including whether such use is of a

1    commercial nature or is for nonprofit educational purposes;

2    (2) the nature of the copyrighted work;

3    (3) the amount and substantiality of the portion used in relation to the
4    copyrighted work as a whole; and

5    (4) the effect of the use upon the potential market for or value of the
6    copyrighted work.

7    The fact that a work is unpublished shall not itself bar a finding of fair use if
8    such finding is made upon consideration of all the above factors. [Emphasis
9    added].

10    Defendants meet none of these criteria in The Episode. Again, although the provided DVD

11   is not viewable, when reviewing the uploaded version of the Episode on YouTube, manufactured

12   attempts at critical commentary occurs (with a possible fifth one second addition) on only four (4)

13   different occasions: between 6:02-7:37=1:35; 11:32-11:39=:07; 12:04-12:12=:08 and

14   22:29-23:03=:34, totaling = 2:24, out of the published running time of a 60 minute show, or 4%

15   (certainly nominal) of The Episode in a (futile) attempt to create the appearance of objective

16   questioning. Almost all of these appear in the first introductory segment. Frankly the rest of The

17   Episode is more of a "reality show" or "infomercial" for Defendant Kelvin's business, in which

18   Defendant Ling inserted herself and seemed to thoroughly enjoy. Additionally, and once again,

19   wherever the moving Defendants got the incorrect idea that The Treatment was a "contest" remains

20   a mystery and is simply preposterous, (see *supra*, p. 3, l. 21 - p. 4, l. 4).

21    One of the most preposterous arguments made by Defendants is as follows: "[t]he

22   Documentary critically examines pickup artists and their techniques. Ms. Ling's tone and ever-

23   present narration are at turns investigatory and highly skeptical. In contrast, the Treatment is an

24   unabashedly positive celebration of the pickup artist community." [ECF 15, p.14, ll.11-13]. It is

25   disingenuous and simply beyond credulity to suggest that The Episode agreed to be produced with

26   Plaintiff would have Defendant Ling standing mutely on the sidelines, and that she would not

27   examine the participants and narrate throughout The Episode, which was created from The

28   Treatment. That is the nature of her series, "This is Life with Lisa Ling." regardless of the fact that

-17-

1  it aired on Defendant CNN's network, it certainly was not "news", unlike other programming aired

2  on Defendant CNN, but rather was approved by Defendant CNN (using The Treatment supplied to

3  Defendant CNN by Plaintiff, via Defendants Part2 Pictures) because of its unusual subject matter

4  which is arguably salacious in nature. Like other 24 hour cable news networks, not everything it airs

5  is "news", e.g. The Episode. The 9th Circuit has fairly recently issued an opinion concerning these

6  issues as follows:

7       "The preamble to the fair use statute lists "news reporting" as an illustrative basis supporting

8  fair use under this factor. 17 U.S.C. §107. We have little doubt that the gossip magazine's

9  sensational coverage of the wedding qualifies as news reporting. Our role in this regard is not as a

10  literary critic. *Campbell*, 510 U.S. at 582, 114 S.Ct. 1164 (whether "in good taste or bad does not and

11  should not matter to fair use"). While the parties agree that the pictures at issue are newsworthy, ***we***

12  ***must nevertheless proceed cautiously because "[t]he promise of copyright would be an empty one***

13  ***if it could be avoided merely by dubbing the infringement a fair use 'news report' of the [work]."***

14  *Harper & Row*, 471 U.S. at 557, 105 S.Ct. 2218.

15       Although news reporting is an example of fair use, it is not sufficient itself to sustain a per se

16  finding of fair use. The "fact that an article arguably is 'news' and therefore a productive use is

17  simply one factor in a fair use analysis." *Id*. at 561, 105 S.Ct. 2218. In other words, fair use has

18  bounds even in news reporting, and no per se "public interest" exception exists. See, e.g., *Murphy*

19  *v. Millennium Radio Grp*. LLC, 650 F.3d 295, 307 (3d Cir. 2011) (***"[N]ews reporting does not enjoy***

20  ***a blanket exemption from copyright. News organizations are not free to use any and all***

21  ***copyrighted works without the permission of the creator simply because they wish to report on the***

22  ***same events a work depicts."***); *Núñez v. Caribbean Int'l News Corp*., 235 F.3d 18, 22 (1st Cir.2000)

23  (allowing publication of three pictures for news purposes, but clarifying that "[t]his is not to say that

24  ... use of the photographs was necessarily fair merely because the photographs were used for news

25  purposes, nor does it establish a general 'newsworthiness' exception."). Because Maya cannot simply

26  take fair use refuge under the umbrella of news reporting, we analyze Maya's coverage in light of

27  two other considerations: the degree of transformation occasioned by Maya's use; ***and the***

28  ***commercial nature of its use."*** *Monge v. Maya Magazines, Inc.*, 688 F.3d 1164, 1173 (9th Cir.

1  2012). [Emphasis added].

2       Without limitation, consider the following: Scenes were staged and re-shot during the filming

3  of The Episode. Characters were given direction. Defendant Ling lobbed "softball" questions at

4  Defendant Kelvin which were responded to with impressive answers, which were certainly not his

5  style, and were actually *given* to agents of Defendant Part2 Pictures by Plaintiff during the months

6  of preparation for the show! The main student in the Episode, "Mitch", was actually visited,

7  interviewed and filmed in Baltimore by Defendant Ling *after* production and filming in the west was

8  done, but edited and inserted at the beginning of The Episode in a misleading attempt to deceive the

9  viewer. Moving Defendants argue The Episode is a "Documentary" - although it is so manipulated

10  that it is tantamount to "Reality TV" - so much so that the entire industry recognized the same by

11  nominating and awarding them in the 2017 "Gracie Awards" #1 in the "Outstanding Non-Fiction or

12  Reality Show" category. They also proudly list and advertise this award on their industry IMDB

13  page. Defendant Ling is not acting in the capacity of a journalist, rather she inserts herself into the

14  story throughout, e.g., without limitation, she gives advice on one of the "makeovers" of the students

15  and muses on who she may "make out" with.[7] None of this can hardly be described as

16  contemporaneous reporting of "news", nor is it plausible to assume that Defendants Part2 Pictures

17  and Ling did not exercise extreme editorial judgment in the production of The Episode. The Episode

18  is hardly a "journalistic expose'", but rather an entertainment production based upon, and certainly

19  substantially similar to, The Treatment.

20  / / /

21  / / /

22

23

24

25  _____

26      [7] In the interests of good taste, any information concerning a personal relationship which
developed between Defendant Ling and a student during the filming of the production will be

27  withheld at this time; needless to say, such a revelation would not bode well for Defendant Ling's
incessant arguments that she was acting in the capacity of an *objective journalist* during the

28  production.

1

**CONCLUSION**

2   For the reasons as set forth in this foregoing Points and Authorities, Plaintiff respectfully

3  requests that Defendants' motion to dismiss be denied, and for such other relief deemed necessary

4  by this Honorable Court. Should this Honorable Court deem otherwise, Plaintiff will respectfully file

5  a prompt Motion for Leave of Court to File First Amended Complaint pursuant to Fed.R.Civ.P.

6  15(a)(2).

7

8                                          Respectfully submitted,

9                                          Dated: May 31, 2018.

10                                         THOMAS S. SHADDIX, ESQ.
                                           /s/ Thomas S. Shaddix
11                                         Nevada State Bar No.: 7905
                                           LAW OFFICE OF THOMAS S. SHADDIX
12                                         6166 South Sandhill Road
                                           Suite 146
13                                         Las Vegas, Nevada 89120
                                           Telephone: (702) 430-8420
14                                         Facsimile: (702) 522-6069
                                           Attorney for Plaintiff,
15                                         NATHANIEL SHAPIRO

16  / / /
17  / / /

18

19

20

21

22

23

24

25

26

27

28

-20-

## DECLARATION

NATHAN SHAPIRO declares as follows:

    1.     I am an adult and am competent to make the following declaration and statements of fact of my own personal knowledge, except as to those statements made upon information and belief, and as to those matters, I believe them to be true.

    2.     That pursuant to the provisions of 28 U.S.C. 1746, I hereby declare under penalty of perjury pursuant to the laws of the United States of America that the foregoing is true and correct of my own personal knowledge, except as to those statements made upon information and belief, and as to those matters, I believe them to be true.

    Executed this 31st day of May, 2018 at Las Vegas, Nevada.

/s/ Nathaniel Shapiro
NATHANIEL SHAPIRO

/ / /
/ / /

-21-

1

## CERTIFICATE OF SERVICE

2

**I HEREBY CERTIFY** that on the 31st day of May, 2018, I served a true and accurate copy of the foregoing through the Court's CM/ECF system to the following parties:

3

4

ADAM H. SPRENGEL, ESQ.

5

MICHAEL A. ARATA, ESQ.

Attorneys for Moving Defendants

6

7

/s/ Thomas S. Shaddix

THOMAS S. SHADDIX, ESQ.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28